UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRIS CACACE and CULINARY EDGE
CREATIONS, LLC,

                                    Plaintiffs,

            -v-

MEYER MARKETING (MACAU COMMERCIAL
OFFSHORE) CO., LTD. and MEYER
CORPORATION, U.S.,

                                    Defendants.

Case No. 06-CV-2938 (KMK)

OPINION AND ORDER

Appearances:

Eric J. Rotbard, Esq.
White Plains, New York
*Counsel for Plaintiffs*

Benjamin D. Enerson, Esq.
Joshua C. Krumholz, Esq.
Tamara F. Carmichael, Esq.
Holland & Knight LLP
New York, New York and Boston, Massachusetts
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiffs Chris Cacace ("Cacace") and Culinary Edge Creations, LLC ("CEC")

(collectively, "Plaintiffs") brought this patent infringement action against Defendants Meyer

Corporation U.S. ("Meyer U.S.") and its affiliate, Meyer Marketing (Macau Commercial

Offshore) Co., Ltd. ("Meyer Macau") (collectively, "Defendants"), alleging that Defendants are

infringing a patent of which Cacace claims ownership and to which CEC claims exploitation

rights.  Meyer U.S. moves for summary judgment on the argument that a written license

agreement with CEC gives Defendants total release from such a claim.  Plaintiffs cross-move for summary judgment, seeking to have the Court declare Defendants liable for infringement.  For the reasons stated in this opinion, both motions are denied.

## I.  Background

### A.  The '174 Patent

United States Patent No. 6,497,174 (the "'174 Patent") was issued to Cacace on or about December 24, 2002.  (Pls.' Counterstatement of Undisputed Material Facts ("Pls.' 56.1-2") ¶ 1; Def. Meyer U.S.'s Resp. to Pls.' Counterstatement of Material Facts ("Def.'s 56.1-2") ¶ 1.)  The '174 Patent concerns the design of raised edge cookware for sautéing and deglazing that enables the operator to "flip" food during the preparation thereof.[1]  (Pls.' 56.1-2 ¶ 2; Def.'s 56.1-2 ¶ 2.)

Cacace thereafter licensed exploitation rights in the '174 Patent to CEC, a company of which he is a principal (Pls.' 56.1-2 ¶¶ 3-4; Def.'s 56.1-2 ¶¶ 3-4), including the right to enter into contracts for the manufacture, marketing, and distribution of products based upon the '174 Patent (Pls.' 56.1-2 ¶ 4).

---

[1] Meyer U.S. has explained what makes a sautéing pan special:

Sautéing is a method of cooking food using a small amount of oil or fat in a shallow pan over relatively high heat.  The term comes from the French verb *sauter*, "to jump," because the food being sautéed is kept moving.  The food can be moved by means of a utensil such as a spoon or spatula, but many professional cooks use a technique that involves quickly pulling the pan backwards towards the body.  This sharp movement of the pan propels the food upward off of the side of the pan opposite the handle, so that it will fall back into the pan.  The food is thus tossed or flipped to keep it moving and [to mix it] together.  In addition to its usefulness, this tossing technique looks impressive, and amateur cooks often try it.  The technique is not always easily performed, however, and even skilled professionals will spill food out of the pan and onto the stove, the floor, or themselves.

(Def. Meyer U.S.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 2.)

B.  The Parties' License Agreement Dated October 28, 2004

At the suggestion of the television shopping network QVC, in January 2004, CEC contacted Meyer U.S., a distributor of cookware and cookware-related products, including the Circulon and Farberware brands, to discuss a potential manufacturing relationship.  (Pls.' Resp. to Def. Meyer U.S.'s Statement of Undisputed Facts ("Pls.' 56.1-1") ¶¶ 12-13; Pls.' 56.1-2 ¶ 6; Def. Meyer U.S.'s Statement of Undisputed Material Facts ("Def.'s 56.1-1") ¶¶ 12-13; Def.'s 56.1-2 ¶ 6.)  CEC sent Meyer U.S. a sample of its pan and was informed that one of Meyer U.S.'s inventors was designing a pan similar in design to the '174 Patent.  (Pls.' 56.1-2 ¶¶ 8-10; Def.'s 56.1-1 ¶¶ 13-14.)  Shortly thereafter, CEC received design drawings from Meyer U.S. of its pan.  (Pls.' 56.1-1 ¶ 15; Def.'s 56.1-1 ¶ 15.)

Following a trade show in May 2004, the Parties began substantive discussions regarding the business terms of a potential arrangement whereby Defendants would manufacture Plaintiffs' pan for QVC.  (Pls.' 56.1-2 ¶¶ 23-24; Def.'s 56.1-2 ¶¶ 23-24.)  The business arrangement was negotiated over the course of many weeks.  (Pls.' 56.1-1 ¶ 27; Def.'s 56.1-1 ¶ 27.)  During these negotiations, the Parties discussed the fact that Defendants wanted to be able to sell their own pan royalty-free if they were to manufacture Plaintiffs' pan for QVC.  (Pls.' 56.1-1 ¶ 24; Def.'s 56.1-1 ¶ 24.)  CEC asked Meyer U.S. to provide it with a drawing of the pan it wanted to exclude from a potential license agreement.  (Pls.' 56.1-1 ¶ 25; Def.'s 56.1-1 ¶ 25.)  In response, Meyer U.S. sent CEC a drawing of the Meyer design (the "Meyer Design") alongside the Cacace '174 Patent design.  (Pls.' 56.1-2 ¶ 36; Def.'s 56.1-2 ¶ 36.)  Upon receiving the Meyer Design, Plaintiffs expressed concern that the Meyer Design infringed on the '174 Patent.  (Pls.' 56.1-2 ¶ 37; Def.'s 56.1-2 ¶ 37.)  Meyer U.S. informed Plaintiffs that it believed the Meyer Design did

3

not infringe, and that Meyer U.S. would not pay royalties on pans manufactured based on the

Meyer Design.  (Pls.' 56.1-2 ¶ 38; Def.'s 56.1-2 ¶ 38.)  CEC then requested a sample of the pan

for which Meyer U.S. wanted a release.  (Pls.' 56.1-2 ¶ 39; Def.'s 56.1-2 ¶ 39.)  On or about

September 22, 2004, CEC received a pan from Defendants, made of stainless steel impact

bonded, with a plastic handle, glass cover, and non-stick cooking surface (the "September 22

Pan").  (Pls.' 56.1-2 ¶ 41; Def.'s 56.1-2 ¶ 41.)  After receiving the September 22 Pan, CEC

ultimately agreed to include a carve-out provision in the proposed license agreement.  (Pls.'

56.1-1 ¶ 26; Def.'s ¶ 26.)

On or about October 28, 2004, the Parties executed a license agreement for Defendants to

manufacture pans based on the '174 Patent (the "License Agreement").  (Pls.' 56.1-2 ¶ 42; Def.'s

56.1-2 ¶ 42.)  The License Agreement granted Defendants a "non-exclusive, non-transferable,

non-assignable and non-sublicensable license to manufacture, sell and advertise Products based

upon the Patents."  (Pls.' 56.1-2 ¶ 43; Def.'s 56.1-2 ¶ 43; Decl. of Christelette A. Hoey in Supp.

of Mot. of Meyer Corporation U.S. for Summ. J. on Defense of Release, Ex. 4 (License

Agreement) § 2(a).)  Under the License Agreement, Defendants agreed to pay a royalty of one

dollar per pan sold based upon the '174 Patent.  (Pls.' 56.1-1 ¶ 28; Def.'s 56.1-1 ¶ 28; License

Agreement § 3(a).)

C.  The Claimed Release

The License Agreement contained language in Section 1(b) carving out the "Licensee's

Pan" from the definition of the term "Products."  As a result of the carve-out, no royalties would

be due upon any sales of the "Licensee's Pan."  (Pls.' 56.1-1 ¶ 39.)  Further, the legend required

to be displayed on the "Licensee's Pan" differed from the legend borne by the "Products."  (*Id.*

¶ 40.)  Under the terms of the License Agreement, neither the manufacturing nor the sale or advertisement of the "Licensee's Pan" constituted infringement of the '174 Patent.  The relevant language is set forth below:

---

1.     **Definitions**

(a)     The word "Patents" means a certain cooking pan design, United States patent no. 6,497,174 (Canadian patent pending).  A copy of this Patent is annexed to this Agreement as Exhibit "A".

 (b)     The word "Products" means any products based upon the Patents.  For purposes of this Agreement, a "Product" shall refer to each single item manufactured according to the Patents, notwithstanding that Licensor may choose to group several Products together into one SKU.  The parties hereby agree that the product depicted on Exhibit "B", a representative sample of which having been submitted to Licensor by Federal Express sent September 22, 2004 ("Licensee's Pan") is not a "Product" and that neither the manufacturing nor the sale or advertisement of Licensee's Pan constitutes infringement of any kind and Licensor hereby releases Licensee from any such liability, <u>provided</u> however that at all times, during the term of this Agreement and after its termination, for so long as the Patent is valid, Licensee ensures that Licensee's Pan bears the following legend on its bottom stamp:  "Manufactured on consent, U.S. patent no. 6,497,174" or "Mfrd. on consent, U.S. pat. no. 6,497,174".  Should Licensee's Pan not bear the legend as agreed, then no release will be effected under this Agreement and Licensor reserves all rights against Licensee.

---

(License Agreement § 1(a)-(b); Pls.' 56.1-1 ¶ 33; Def.'s 56.1-1 ¶ 33.)

The Parties dispute the meaning of the above provisions and, in particular, the definition and scope of the term "Licensee's Pan."  (Decl. of Edward Ryan in Opp. to Def.'s Mot. for Summ. J. and Supp. of Pls.' Cross-Mot. for Summ. J. ¶ 2 ("The issue before the Court is a

determination of the scope of 'Licensee's Pan' as defined in Section 1(b) of the License Agreement.").)

    D.  <u>The Circulon and Farberware Pans</u>

The License Agreement required Defendants to manufacture a minimum of 50,000 pans based on the '174 Patent, which they did, and Defendants paid CEC royalties of at least $50,000. (Pls.' 56.1-1 ¶ 29; Def.'s 56.1-1 ¶ 29.)

Also during the term of the License Agreement, Meyer U.S. manufactured and sold a raised-edge cookware product under the Circulon brand (the "Circulon Pan").  (Pls.' 56.1-2 ¶ 58; Def.'s 56.1-2 ¶ 58.)  This Circulon Pan was not identical to the September 22 Pan.  (Pls.' 56.1-2 ¶ 59; Def.'s 56.1-2 ¶ 59.)  Unlike the September 22 Pan, which was made of stainless steel, the Circulon Pan was made of anodized aluminum, had a different handle, and had no lid.  (Pls.' 56.1-2 ¶ 60; Def.'s 56.1-2 ¶ 60.)  The bottom of the Circulon Pan was engraved or stamped with the phrase "Manufactured on consent, U.S. Patent No. 6,497,174."  (Pls.' 56.1-2 ¶ 61; Def.'s 56.1-2 ¶ 61.)  Defendants paid no royalties to Plaintiffs on the Circulon Pan.  (Pls.' 56.1-2 ¶ 62; Def.'s 56.1-2 ¶ 62.)

The License Agreement was not renewed following the expiration of its term, which ended on December 31, 2005.  (Pls.' 56.1-2 ¶ 63; Def.'s 56.1-2 ¶ 63; License Agreement § 2(d).) After the License Agreement expired, Meyer U.S. introduced another raised-edge cookware product under the Farberware brand (the "Farberware Pan") in or about March 2006.  (Pls.' 56.1-2 ¶ 66; Def.'s 56.1-2 ¶ 66.)  The Farberware Pan differed from the Circulon Pan and the September 22 Pan in that it had different build materials and a different handle.  (Pls.' 56.1-2

¶ 67; Def.'s 56.1-1 ¶ 49.)  Defendants paid no royalties to Plaintiffs on the Farberware Pan. (Pls.' 56.1-2 ¶ 68; Def.'s 56.1-2 ¶ 68.)

The Parties dispute whether or not the Circulon and Farberware Pans qualify as the "Licensee's Pan" and are thereby excluded from the royalty and patent infringement provisions of the License Agreement.

### E.  Procedural History

Plaintiffs filed their Complaint on April 14, 2006.  The Complaint alleges two counts of patent infringement in violation of 36 U.S.C. § 271:  (1) in connection with certain cookware marketed under the brand "Circulon"; and (2) in connection with certain cookware marketed under the brand "Farberware."  Plaintiffs seek a declaration of infringement, an injunction from further infringement, damages with pre-judgment and post-judgment interest, attorneys' fees and costs, and other relief.

Meyer U.S. filed an Answer on June 16, 2006.  The Meyer U.S. Answer asserted ten enumerated defenses and stated five counterclaims against Plaintiffs for: (1) declaratory judgment of non-infringement of the '174 Patent; (2) declaratory judgment that the '174 Patent is invalid; (3) unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) tortious interference with advantageous relationships; and (5) violations of the California Business and Professions Code §§ 17200(a) *et seq.* and 17500 *et seq.*, for unfair competition and unfair and deceptive trade practices.

Meyer Macau filed an Answer on March 19, 2007.[2]  The Meyer Macau Answer asserted eleven enumerated defenses and stated two counterclaims against Plaintiffs for: (1) declaratory judgment of non-infringement of the '174 Patent; and (2) declaratory judgment that the '174 Patent is invalid.

On October 23, 2006, Meyer U.S. moved for summary judgment on the grounds that Plaintiffs' claims are barred by the License Agreement and the release granted therein.  (Def.'s Mem. 1.)  On December 28, 2006, Plaintiffs cross-moved for summary judgment on the grounds that the Circulon and Farberware Pans are not the "Licensee's Pan" and should be deemed infringing.  (Pls.' Mem. in Opp. to Def.'s Mot. for Summ. J. and in Supp. of Pls.' Cross-Mot. for Summ. J. ("Pls.' Mem.") 16.)  On August 6, 2007, the case was reassigned from Judge Colleen McMahon to this Court.  The Court held oral argument on October 22, 2008.

## II.  Discussion

### A.  Standard of Review

#### 1.  Summary Judgment

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor.  *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85

---

[2] On August 4, 2006, Meyer Macau filed a Motion to Dismiss for insufficient service. (Dkt. No. 17.)  On October 25, 2006, Judge Colleen McMahon denied Meyer Macau's Motion and gave Plaintiffs until December 31, 2006 to effect service on Meyer Macau.  (Dkt. No. 31.) Although the Parties advised the Court, in a joint status letter dated October 22, 2007, that Meyer Macau was served prior to December 31, 2006, no proof of service was filed with the Court until June 19, 2008, pursuant to the Court's May 8, 2008 Order.  (Dkt. No. 63.)

(2d Cir. 2006).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006).  "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his [or her] favor."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'"  *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").  A fact is material when "it might affect the outcome of the suit under the governing law."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that the materiality of the facts considered by the court will be governed by substantive law).  At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial.  *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).  A court's goal should be to "isolate and dispose of factually insupportable claims."  *Celotex*, 477 U.S. at 323-24.

        With respect to a contract claim, a court may construe the contract and grant summary judgment when the language is "'plain and unambiguous.'"  *See Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 164 (2d Cir. 2005) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d

142, 148 (2d Cir. 1993)); *see also Hanson v. McCaw Cellular Commc'ns, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996) ("When the interpretation of a contract is at issue, summary judgment is proper where the language of the contract is unambiguous, lending itself to only one reasonable interpretation."). Accordingly, "unless the moving party can establish that contractual language is not 'susceptible of at least two fairly reasonable meanings,' a material issue exists concerning the parties' intent, and the non-moving party has a right to present extrinsic evidence regarding the meaning of the contested term." *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985) (quoting *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983)).

### 2. Contract Interpretation

The Parties agree that New York law applies to the License Agreement. (Pls.' Mem. 2; Def.'s Mem. 12; License Agreement § 15 ("This Agreement and the rights and obligations of the parties will be governed by and construed in accordance with the law of the State of New York.").) *See Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (applying New York law where "the parties do not dispute that New York law applies"); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 11-12 (1972) (according presumptive validity to choice of law provisions in contract); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 793 (2d Cir. 1980) (in federal question case, applying New York law where contract contained a New York choice of law clause).

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (citing *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280 (N.Y. 1978)). Thus, the Court's analysis properly starts with the four corners

of the contract to determine whether the meaning is unambiguous.  *See RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (where a "'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence'" (quoting *De Luca v. De Luca*, 751 N.Y.S.2d 766, 766 (App. Div. 2002))); *Terwilliger*, 206 F.3d at 245 ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument." (citing *Teitelbaum Holdings, Ltd. v. Gold*, 396 N.E.2d 1029 (N.Y. 1979))).  The ultimate determination of the parties' intent depends on the contract text and not on the fact that the parties urge different interpretations of the License Agreement.  *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."); *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08-CV-4746, 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) ("'The language of a contract is not made ambiguous simply because the parties urge different interpretations.'" (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992))).  If a contract is unambiguous, then its proper construction is a question of law.  *See Metro. Life Ins.*, 906 F.2d at 889 ("Under New York law . . . , if a contract is unambiguous on its face, its proper construction is a question of law.").  However, "'[w]here the intent of the parties is too ambiguous to be gleaned from the contract alone, the Court should receive evidence that might better clarify that intent.'"  *Gitnik v. Home Depot U.S.A., Inc.*, No. 07-CV-1244, 2007 WL 2728358, at *2 (S.D.N.Y. Sept. 18, 2007) (quoting *DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*, No. 03-CV-1568, 2003 WL 22283836, at *4 (S.D.N.Y. Oct. 2, 2003)).

B.  Meaning of License Agreement Section 1(b)

The Parties disagree on the meaning of License Agreement Section 1(b).  Meyer U.S.

contends that Section 1(b) contains an agreement "that the Meyer Design was *not* licensed and

yet did *not* infringe."  (Def.'s Mem. 17.)  Plaintiffs contend that Section 1(b) is a much more

limited consent not to sue Defendants for the manufacture, sale, or advertisement of one

particular pan product, matching exactly the referenced representative sample and bearing a

required "on consent" stamp.  (Pls.' 56.1-1 ¶ 26.)  Thus, the Court will analyze Section 1(b) to

determine whether the scope and meaning of the release provision are unambiguous.  *See Gitnik*,

2007 WL 2728358, at *2 (A court's "first key inquiry when interpreting a contract is to consider

whether the contract is unambiguous with respect to the question disputed by the parties").

Under the License Agreement, the defined term "Product" triggers royalty payments by

Defendants to Plaintiffs of one dollar for every "Product" manufactured.  (License Agreement

§ 3(a).)  The text of the first sentence defining the term "Product" is:

(b)  The word "Products" means any products based upon the
Patents.

This first sentence of the definition differentiates the defined term "Products" from the

ordinary English language word "products."  The word "product" has the dictionary definition of

"[s]omething that is distributed commercially for use or consumption."  Black's Law Dictionary

1245 (8th ed. 2004).[3]  The final four words of the sentence operate to limit the defined term to

those that are "based upon the Patents."  The term "Patents" is defined in License Agreement

---

[3] The full definition reads:  "Something that is distributed commercially for use or
consumption and that is usu[ally] (1) tangible personal property, (2) the result of fabrication or
processing, and (3) an item that has passed through a chain of commercial distribution before
ultimate use or consumption."  Black's Law Dictionary 1245 (8th ed. 2004).

Section 1(a) as "a certain cooking pan design, United States patent no. 6,497,174 (Canadian patent pending)."  In sum, then, the first sentence plainly can be read as providing a general definition of "Products" to mean items manufactured based upon the design embodied in the '174 Patent.

The text of the second sentence defining the term "Product" is:

> For purposes of this Agreement, a "Product" shall refer to each single item manufactured according to the Patents, notwithstanding that Licensor may choose to group several Products together into one SKU.

The second sentence builds on the first by adding specificity that the defined term "Product" applies to "each single item manufactured" rather than any grouping in which more than one item would be sold.[4]  This sentence clarifies what royalty would be owed by Defendants to Plaintiffs on, for example, a package of three pans sold to a customer in a single unit where each of those three pans would have triggered a one dollar royalty payment if sold separately.

Plaintiffs urge the Court to interpret the Parties' definition of the singular "Product" as supporting their argument that the "Licensee's Pan" refers to a single and particular pan.  Thus, Plaintiffs argue that because Section 1(b) states that the "Licensee's Pan" is not a "Product," it contemplated one pan – the September 22 Pan.  Meyer U.S. argues that the clear intent in defining "Product" in the singular was to ensure that a royalty payment would be paid for each qualifying pan made under the '174 Patent.  Therefore, Meyer U.S. argues that when the Parties

---

[4] The Court takes that to be the meaning of the term SKU.  *See* Encyclopedia Britannica Online (2007), *at* http://www.brittanica.com/EBchecked/topic/1242199/SKU ("As part of a system of inventory control, the SKU represents the smallest unit of a product that can be sold from inventory, purchased, or added to inventory.").

agreed that the "Licensee's Pan" is not a "Product," the intent was to carve out any pans based on the Meyer Design from the royalty payment provisions.  It is with this dispute in mind that the Court next turns to the third clause of Section 1(b).

The text of the third sentence defining the term "Product" is:

> The parties hereby agree that the product depicted on Exhibit "B", a representative sample of which having been submitted to Licensor by Federal Express sent September 22, 2004 ("Licensee's Pan") is not a "Product" . . . .

This next sentence operates to exclude a class of items from the defined term "Product," meaning that these items would not trigger royalty payments.  The Parties agree to this, and the disputed question is only what, precisely, is carved out from the definition.  The phrase admits two possibilities:  first, "the product depicted on Exhibit 'B,'" and second, the "representative sample of [such product] having been submitted to Licensor by Federal Express sent September 22, 2004."

Plaintiffs urge the Court to find that the "representative sample" is what is being excluded from the defined term "Product."  In particular, Plaintiffs argue that "[t]he License Agreement explicitly carved out one particular Meyer product, not the design, from the definition of 'Product' (not 'Products') which is separately defined."  (Pls.' 56.1-1 ¶ 32.)  They note that the exception in Section 1(b) makes no mention of a "design," and if the Parties had wanted to exempt the Meyer Design, they would have used the word "design" as opposed to "product."  (*Id.*)  Therefore, Plaintiffs argue that Exhibit B is simply "a depiction of a particular, single, authorized product."  (*Id.* ¶ 37.)

Meyer U.S. argues that the language referring to the representative sample in Section 1(b) is merely an appositional phrase, providing information that is additional but not necessary

to the provision.[5]  Meyer U.S. specifically notes that as the sentence is parsed above, the subject

is the "product depicted" and not the "representative sample."  Meyer U.S. further argues that a

common sense reading of the clause would be that the "representative sample" would be just that

– a representative example of what is depicted by Exhibit B, which is a design diagram.

Therefore, Meyer U.S. contends "the product depicted on Exhibit 'B'" is being carved out, and

because Exhibit B is a drawing of the Meyer Design, Section 1(b) serves to carve out products

based on the Meyer Design from the License Agreement.  In this regard, Meyer U.S. claims that

the fact that Exhibit B itself is titled "Licensee's Pan" and contains a figure named "Meyer

Design" alongside a figure named "Cacace Design (U.S. Patent #6197174)" indicates that the

Parties intended the term "Licensee's Pan" to reference the *design* contained within Exhibit B,

rather than the actual September 22 Pan sent to Plaintiffs.  (Def.'s 56.1-2 ¶ 34; License

Agreement, Ex. B.)

 Having reviewed the language of Section 1(b) within the context of the License

Agreement, the Court finds that there is a genuine issue of fact with respect to whether the

Parties intended for a particular product (the "Representative Sample") or a design ("Exhibit B,"

which Defendants contend is the Meyer Design) to be excluded from Section 1(b).

 The Court agrees with Defendants that a reasonable interpretation of Section 1(b) would

exclude "the product depicted on Exhibit B."  Under this interpretation, the design depicted in

Exhibit B (which would include any pan of that design regardless of build material or color) is

the only product excluded from the royalty obligations to Plaintiffs.  However, such a reading

---

[5] "Two phrases are in *apposition* when they're logically equivalent and in the same
grammatical relation to the rest of the sentence:  it's a way of explaining a word or phrase, or
giving additional information about it."  Jack Lynch, *Guide to Grammar and Style* (last revised
Jan. 9, 2008), *available at* http://andromeda.rutgers.edu/~jlynch/Writing/a.html.

would render the clause "a representative sample of which having been submitted to Licensor by

Federal Express sent September 22, 2004" potentially meaningless, thereby contradicting the

well-known axiom of contract interpretation that courts are to give meaning to every word or

phrase in a contract.  *See JA Apparel Corp. v. Abboud*, No. 07-CV-7787, 2008 WL 2329533, at

*9 (S.D.N.Y. June 5, 2008) ("[P]ursuant to a long-standing and unassailable rule of contract

interpretation, the Court is required to give meaning to every term in the Agreement.");

*Helmsley-Spear, Inc. v. N.Y. Blood Ctr., Inc.*, 687 N.Y.S.2d 353, 357 (App. Div. 1999) ("Courts

should construe a contract so as to give meaning to all of its language and avoid an interpretation

that effectively renders meaningless a part of the contract." (citing *Two Guys from Harrison-*

*N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984))).  Thus, while Defendant's

interpretation of the contract is not unreasonable, neither can it be said that Plaintiffs'

interpretation is unreasonable.  In other words, the contract is ambiguous.

    Where, as here, the meaning of a particular contractual provision is ambiguous and the

intent of the parties cannot be determined by the language of the provision, a question of fact is

presented which should be resolved by a jury.  *See Hoyt v. Andreucci*, 433 F.3d 320, 331 (2d Cir.

2006); *Postlewaite*, 411 F.3d at 67 (holding that when the "meaning of the contract is ambiguous

. . . a question of fact is presented which cannot be resolved on a motion for summary judgment"

(internal quotation marks omitted)); *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138-39

(2d Cir. 2000) ("The language of a contract is ambiguous if it is capable of more than one

meaning when viewed objectively by a reasonably intelligent person who has examined the

context of the entire integrated agreement." (internal quotation marks omitted)); *Gitnik*, 2007

WL 2728358, at *2 (noting that a court should receive additional evidence as to the parties'

16

intent if the contract is ambiguous).[6]

### C.  Application of Section 1(b) to the Circulon and Farberware Pans

Because the Court finds that there is a material question of fact with regard to what pan was carved out of Section 1(b), the Court also finds that a question of fact is presented with respect to the application of Section 1(b) to the Circulon and Farberware Pans.

Plaintiffs contend that "neither the Farberware nor the Circulon products match the representative sample" and therefore "Meyer's manufacture, advertisement and sale of same breach[] the License Agreement."  (Pls.' Mem. 9.)  Plaintiffs argue that because the Licensee's Pan is not identified by a design but by an actual representative sample, "the materials, build quality, [and] aesthetics are absolutely relevant in determining whether a product matches the representative sample."  (Pls.' 56.1-1 ¶ 37.)  Therefore, because the Circulon and Farberware Pans were built from different materials and contain a different coating than the September 22

---

[6] While not relevant to the interpretation of the contract's language, it bears noting that Plaintiffs argue that during the course of negotiations, they expressed to Defendants their concern that the drawing contained on Exhibit B was insufficiently specific about the type of pan for which Defendants wanted a release and, as a result, Plaintiffs would not agree to a carve-out provision that only referenced Exhibit B.  Plaintiffs claim that it was only after they saw the particular pan Defendants wanted to sell (the September 22 Pan), and Defendants agreed to reference that pan in the carve-out provision, that Plaintiffs were satisfied with and agreed to the language in Section 1(b).  However, the validity of Plaintiff's explanation is a question of fact that cannot be resolved by the Court.  Indeed, the Parties' recollections of the negotiating process with respect to the Section 1(b) release, both in their briefing and during oral argument, were conflicting.  For example, Plaintiffs argue that during the negotiations leading up to the License Agreement, the Parties agreed that Defendants would be authorized to manufacture and sell "a particular product that was depicted in Exhibit B and which was actually provided to CEC (the representative sample)."  (Pls.' 56.1-1 ¶ 32.)  In support of this position, Plaintiffs reference a string of emails between the Parties wherein Plaintiffs requested that Meyer U.S. send a "final version of Meyer's own unique version of the pan."  (Pls.' 56.1-2 ¶ 39.)  Meyer U.S. states that the negotiations and correspondence regarding a "final version" were referencing the Meyer Design and not one particular pan.  (Def.'s 56.1-1 ¶ 32.)  These factual disputes should be resolved by the trier of fact.

17

Pan, they are not covered under Section 1(b).  (Pls.' 56.1-2 ¶¶ 60, 67.)  Plaintiffs allege that there are actual design differences between the September 22 Pan and the Circulon and Farberware Pans, particularly with regard to the handle.  (Pls.' 56.1-1 ¶¶ 44, 48.)  Plaintiffs further argue that "even if the Court were to find that either the Circulon or Farberware products somehow matched the representative sample, the fact remains that Meyer was permitted to manufacture, advertise and sell one specific product, not both."  (Pls.' Mem. 10.)

Meyer U.S. disagrees.  First, Meyer U.S. argues that the carve-out provision for the "Licensee's Pan" excludes pans based on the Meyer Design (Exhibit B) and not based on the materials used to construct any one specific pan.  (Def.'s 56.1-1 ¶ 37.)  Because the Circulon and Farberware Pans were based on Exhibit B, they qualify as "Licensee's Pan," and are not licensed and not infringing.  In support of this argument, Meyer U.S. points out that Exhibit B shows only the design and does not discuss or disclose any other physical aspect of the pan, including build materials.  Second, Meyer U.S. points out that the scope of the '174 Patent, which Plaintiffs claim is infringed by the Circulon and Farberware Pans, does not encompass the materials used to construct or coat the pan – a fact Plaintiffs do not contest.  (Pls.' 56.1-1 ¶ 8; Def.'s 56.1-1 ¶ 8.)  Finally, Meyer U.S. argues that the Farberware and Circulon Pans were the "very same design" as the September 22 Pan, and it was only the build materials that were different.  (Def.'s 56.1-2 ¶ 67.)

The Court, therefore, finds that there exists a material question of fact with respect to whether or not Section 1(b) is applicable to the Circulon and Farberware Pans.  As discussed above, part of the resolution of this issue depends on whether Section 1(b) excludes Exhibit B (the Meyer Design) or the representative sample (the September 22 Pan).  Regardless of what

interpretation prevails, however, there is an additional question of fact with respect to whether either the Farberware or Circulon Pans, or both, match the September 22 Pan or Meyer Design. As a result, summary judgment is not appropriate. *See Celotex*, 477 U.S. at 322 (holding that summary judgment is only appropriate when there is no genuine issue as to any material fact).

## III. Conclusion

Defendant Meyer U.S.'s Motion for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment are both denied. The Clerk of the Court is respectfully directed to terminate the pending motions on the docket (Dkt. Nos. 27 & 38).

SO ORDERED.

Dated:        December 2, 2008
              White Plains, New York

                                    KENNETH M. KARAS
                                    UNITED STATES DISTRICT JUDGE

19

Service List (by ECF)

Eric Jon Rotbard, Esq.
81 Main Street, Suite 205
White Plains, NY 10601
Email: erotbard@optonline.net
*Counsel for Plaintiffs*

Benjamin D. Enerson, Esq.
Joshua C. Krumholz, Esq.
Holland & Knight, LLP
10 St. James Avenue
Boston, MA 02116
Email: benjamin.enerson@hklaw.com
        joshua.krumholz@hklaw.com

Tamara F. Carmichael, Esq.
Holland & Knight LLP
195 Broadway
New York, NY 10007
Email: tamara.carmichael@hklaw.com
*Counsel for Defendants*